UNITED STATES, Appellant

v.

Thomas J. HAYES, Midshipman
U.S. Navy, Appellee

No. 11-5003

Crim. App. No. 201000366

United States Court of Appeals for the Armed Forces

Argued November 2, 2011

Decided February 13, 2012

BAKER, C.J., delivered the opinion of the Court, in which
ERDMANN and RYAN, JJ., and COX, S.J., joined.  STUCKY, J., filed
a separate opinion concurring in the result.

Counsel

For Appellant:  Lieutenant Kevin D. Shea, JAGC, USN (argued);
Colonel Louis J. Puleo, USMC, and Brian K. Keller, Esq. (on
brief); Colonel Kurt J. Brubaker, USMC.

For Appellee:  Major Jeffrey R. Liebenguth, USMC (argued);
Captain Paul C. LeBlanc, JAGC, USN (on brief).

Amicus Curiae for Appellee:  Justin Lepp (law student) (argued);
Mark Zoole, Esq. (supervising attorney) (on brief) -- for
Washington University School of Law.

Military Judge:  Bruce MacKenzie

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Chief Judge BAKER delivered the opinion of the Court.

A military judge sitting as a general court-martial at the U.S. Naval Academy, Annapolis, Maryland convicted Appellee, pursuant to his pleas, of eleven specifications of selling military property without authority and ten specifications of larceny of military property, in violation of Articles 108 and 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 908, 921 (2006).  Appellee was sentenced to confinement for thirty-six months, forfeiture of all pay and allowances, dismissal, and a $28,000 fine.  The convening authority approved the adjudged sentence but suspended all confinement in excess of twelve months.

On review, the United States Navy–Marine Corps Court of Criminal Appeals (NMCCA) set aside the findings of guilty and the sentence and remanded for rehearing.  United States v. Hayes, No. NMCCA 201000366 (N–M. Ct. Crim. App. Jan. 27, 2011).

The Government subsequently certified three issues to this Court:

I.

WHETHER THE NAVY-MARINE CORPS COURT OF CRIMINAL APPEALS ERRED WHEN IT HELD THAT [APPELLEE]'S UNSWORN STATEMENT DURING PRESENTENCING RAISED THE "POSSIBLE DEFENSE" OF DURESS.

II.

WHETHER THE NAVY-MARINE CORPS COURT OF CRIMINAL APPEALS ERRED, AS A MATTER OF LAW, WHEN IT FOUND THAT

THE ACCUSED'S UNSWORN STATEMENT RAISED THE POSSIBILITY
OF A DEFENSE WHEN THE FACTS ON THE RECORD DID NOT
ESTABLISH A PRIMA FACIE CASE FOR DURESS.

III.

WHETHER THE NAVY-MARINE CORPS COURT OF CRIMINAL
APPEALS ERRED WHEN IT SET ASIDE THE FINDINGS AND
SENTENCE DUE TO THE MILITARY JUDGE'S FAILURE TO
INVESTIGATE [APPELLEE]'S PLEA FOR THE POSSIBILITY OF A
DURESS DEFENSE BECAUSE SUICIDE CANNOT, AS A MATTER OF
LAW, BE THE THREAT NECESSARY TO ESTABLISH THE DEFENSE
OF DURESS.

For the reasons set forth below, we conclude that the NMCCA erred when it held that Appellee's unsworn statement raised a possible defense of duress. Among other things, in the course of his plea inquiry Appellee repeatedly disavowed that there were circumstances that forced him to take the items and that he could have avoided the misconduct. Moreover, the thefts occurred over five months, nullifying the sense of immediacy the duress defense contemplates and indicating that Appellee had opportunity to avoid committing the acts without causing harm.

We also conclude that the NMCCA did not err when it held that in a guilty plea context, as a matter of law, a possible defense of duress could be raised requiring further inquiry by the military judge without the accused first presenting a prima facie case of duress. We do not foreclose the possibility that,

in an appropriate case, the threat of suicide could provide the basis for a duress defense as a matter of law.[1]

## I. BACKGROUND

A. Facts

Appellee was a twenty-six-year-old midshipman first class at the U.S. Naval Academy when he stole laboratory equipment from the Naval Academy and sold it on eBay. The acts took place on ten separate occasions between October 2008 and February 2009. The equipment was located in an engineering lab in Rickover Hall onboard the U.S. Naval Academy. In his stipulation of fact and during the plea colloquy with the military judge, Appellee explained how he typically sold the equipment: he would list the equipment on eBay, wait until the highest bidder won the auction, steal the equipment from the lab, mail it to the bidder, and finally receive electronic payment from PayPal. Appellee stated that he earned about $13,000 from the sales.

During his plea colloquy, the military judge asked Appellee with respect to each charge "[w]ere there any circumstances which forced you to take this item?" or words to that effect.

---

[1] Oral argument in this case was heard at Washington University School of Law, St. Louis, Missouri, as part of the Court's "Project Outreach." See United States v. Mahoney, 58 M.J. 346, 347 n.1 (C.A.A.F. 2003). This practice was developed as part of a public awareness program to demonstrate the operation of a federal court of appeals and the military justice system.

Likewise, the military judge asked Appellee "could you have avoided . . . doing this?" or other words to the same effect. Appellee stated that no one forced him to steal the equipment and that he had no justification or excuse for doing so.

During an unsworn statement during presentencing, Appellee explained the background for what he had done, including the pressure he felt regarding his mother's financial and personal well-being. During his first year at the Academy, his mother, Mrs. Jackson, "would call and she would ask if there was any way I could help out" since she was "short on money." By his junior year, Appellee was receiving "daily" phone calls from Mrs. Jackson saying that "she didn't want to lose her house" and that "it was [Appellee's] responsibility to help her because [he was] her eldest son." Appellee talked to a chaplain and a counselor about his situation, and they told him he needed to focus on graduating and that his mother was "an adult, she needs to take care of herself." His mother's calls continued and "it got to a point where she would -- she would call crying and -- and then say that she didn't want to live any more and that she, you know, was thinking about taking her life." Appellee stated that he "didn't know how to handle that," that his father could not help because he had passed away, and that he was worried his younger brothers and sisters "were going to lose their mom."

During his unsworn statement, Appellee also described the first time he stole equipment from the lab:

> [I]t was purely curiosity, you know . . . how much things were worth, and I was like, "Well, my mom needs money, there's all these extra things laying around." I know it wasn't right, but in my state of mind I just -- I just couldn't differentiate the difference between doing the right thing for -- for home or doing the right thing that's going to make the phone calls stop, or doing the right thing for being a Midshipman.

Appellee also described what he did with the money after he sold the equipment:

> I used the money, and I'd go home every weekend, and whether -- whatever my mom needed I was doing, whether it was just taking her out to dinner or taking all my brothers and sisters out for ice cream, I mean just being there. I'm not -- I didn't know how to deal with somebody who's threatening to end their life or threatening to, you know, not be there anymore.
>
> And that's -- that's the pressure that I was feeling at that time, sir . . . .

At presentencing Appellee submitted a signed letter from his mother stating that at that time she had made frequent phone calls to her son making him feel guilty for not helping out. She stated that, when Appellee was "not doing what I thought was his job, I made him feel guilty and increased the pressure with constant phone calls and telling him my thoughts about ending my life." She noted that when her son "feared for my safety he came home and helped me out financially."

The military judge did not reopen the providence inquiry following Appellee's unsworn statement and did not reject the

guilty plea.  The military judge also did not ask defense counsel whether he had discussed any potential defenses with his client.

B.  NMCCA Decision

On appeal to the NMCCA, Appellee argued that his presentencing statement raised matters inconsistent with his plea and thus the military judge had erroneously failed to reopen the providence inquiry to inquire into potential duress and mental responsibility defenses raised by Appellee's unsworn statement during sentencing.  Hayes, No. NMCCA 201000366, slip op. at 3.  The NMCCA agreed with Appellee and held that his unsworn statement raised a possible defense of duress because it "sets forth matter clearly inconsistent with his admission of culpability."  Id.  The court noted that Appellee had indicated that "he was under apprehension and fearful that his mother would commit suicide, and . . . that he committed his acts in order to prevent that from happening, indicating some immediacy in his mind as to the prospective threat."  Id. at 4.  The court also noted that, because the military judge had not inquired into the issue, the court lacked "adequate facts on the record to resolve the conflict [so that it could] only speculate and cannot be confident that the appellant was not under duress when he committed the acts to which he pled guilty."  Id.  The court did not directly discuss whether the threat of suicide could be

included in the duress defense, but clearly its decision is based on the assumption that the threat of suicide could provide the predicate for a duress defense.  The NMCCA remanded Appellee's case for rehearing.  Id.

## II.  DISCUSSION

This Court reviews "a military judge's decision to accept a guilty plea for an abuse of discretion and questions of law arising from the guilty plea de novo."  United States v. Inabinette, 66 M.J. 320, 322 (C.A.A.F. 2008).  An abuse of discretion occurs when there exists "something in the record of trial, with regard to the factual basis or the law, that would raise a substantial question regarding the appellant's guilty plea."  Id.  Article 45, UCMJ, 10 U.S.C. § 845 (2006), includes procedural requirements to ensure that military judges make sufficient inquiry to determine that an accused's plea is knowing and voluntary, satisfies the elements of charged offense(s), and more generally that there is not a basis in law or fact to reject the plea.  Specifically:

> If an accused after arraignment makes in irregular pleading, or after a plea of guilty sets up matter inconsistent with the plea, or if it appears that he has entered the plea of guilty improvidently or through lack of understanding of its meaning and effect, or if he fails or refuses to plead, a plea of not guilty shall be entered in the record, and the court shall proceed as though he had pleaded not guilty.

Article 45(a), UCMJ.  Consistent with Article 45, UCMJ, "If an accused sets up matter inconsistent with the plea at any time during the proceeding, the military judge must either resolve the apparent inconsistency or reject the plea."  United States v. Phillippe, 63 M.J. 307, 309 (C.A.A.F. 2006) (citations and quotation marks omitted); see Article 45(a), UCMJ.  A military judge who fails to do so has abused his or her discretion.

A.  Threshold for Further Inquiry

The initial question in this case is posed by the second certified issue:  what is the threshold for determining when additional inquiry is required when a matter is raised that potentially offers the accused a defense to a guilty plea?  The Government argues that the current distinction between a "possible defense" and the "mere possibility of a defense" is vague.  As a result, it further argues that an accused should be required to present a prima facie defense before the threshold for further inquiry is met.  Appellee, who prevailed below, does not argue for a change in the threshold.

We decline to accept the Government's invitation to adopt a prima facie case as the threshold for inquiring into a possible defense.  The "possible defense" standard is intended to serve as a lower threshold than a prima facie showing because it is intended as a trigger to prompt further inquiry pursuant to Article 45, UCMJ, and United States v. Care, 18 C.M.A. 535, 541,

9

40 C.M.R. 247, 253 (1969), not to determine whether the defense is available or whether members in a contested case should be given an instruction.  Adherence to the "possible defense" standard also furthers Congress's intent behind Article 45, UCMJ, to ensure "the acceptance of a guilty plea be accompanied by certain safeguards to insure the providence of the plea, including a delineation of the elements of the offense charged and an admission of factual guilt on the record."  Id. at 538, 40 C.M.R. at 250 (citing United States v. Chancelor, 16 C.M.A. 297, 36 C.M.R. 453 (1966)).

An affirmative defense to a charged offense would, by definition, constitute a matter "inconsistent with the plea" of guilty and therefore the military judge must resolve the apparent inconsistency or reject the plea.  Article 45, UCMJ; Phillippe, 63 M.J. at 309.  Thus, the Government's proposal that we require a prima facie showing of a defense before further plea inquiry is necessary asks too much.  If the record presented to the military judge makes out a prima facie case then by definition the accused will have "set[] up matter[s] inconsistent with the plea" and a substantial basis in law or fact will exist to reject the plea.  Article 45(a), UCMJ.  Thus, unless further inquiry by the military judge overcomes the apparent "prima facie case" and demonstrates that the defense does not in fact exist, the military judge will have to reject

10

the plea and leave the resolution of the matter to the trier of fact.

We recognize that the distinction between a "possible defense" and the "mere possibility of a defense" can be amorphous, especially in the appellate abstract. But it is necessarily so. It is the military judge who is hearing the plea and observing the accused who gives substance to these terms. Moreover, though we might use different words to describe the distinction, over time case law has given meaning to the distinction between the possibility of a defense and the mere possibility of a defense. Not every mitigating statement or word requires further inquiry. Thus, a military judge is not required to reopen a plea and inquire further where an accused raises the "mere possibility of a defense." United States v. Shaw, 64 M.J. 460, 642 (C.A.A.F. 2007) (citation and quotation marks omitted).

As noted, our cases have also given meaning to the above distinction. In Phillippe, for example, the Court held that an accused's guilty plea to unauthorized absence was improvident where his statement raised the possibility that he surrendered or attempted to surrender to military authorities. 63 M.J. at 311. Because the statement "lai[d] out the elements of a possible defense," the military judge's failure to inquire further into the possible defense was in error. Id. This is

close to the prima facie case the Government argues for; however, that does not mean that a military judge is not required to make further inquiry until this point, only that if the military judge has not done so, he will have clearly erred.

In United States v. Resch, the Court held that, where an accused who pled guilty to unauthorized absence stated that he had "contacted" his recruiter, he set up a mere possibility of a conflict with his plea since "contacted" suggested "something other than physical submission to military authorities," which is necessary for that defense. 65 M.J. 233, 238 (C.A.A.F. 2007) (quotation marks omitted). Because the record did not indicate that the accused "physically presented himself to military authorities for the purpose of surrendering," it was not improper for the military judge to accept the plea. Id.

In United States v. Olinger, this Court held that it was not improper for a military judge to accept the accused's guilty plea to unauthorized absence and missing military movement in light of the accused's unsworn statement at sentencing that he thought his wife's depression "'might kill her'" if he deployed. 50 M.J. 365, 367 (C.A.A.F. 1999). This type of "vague speculation" was insufficient and did not provide a "substantial basis for addressing the applicability of the necessity defense in the military justice system." Id.

In United States v. Logan, the Court held that an accused's statement in mitigation that he had received phone calls threatening his family's safety did not raise a possible defense of duress given that the threats occurred thousands of miles away from his family and that the accused "did not attribute his motivation for committing the offenses solely to his alleged fear for their safety."  22 C.M.A. 349, 351, 47 C.M.R. 1, 3 (1973).

Based on the foregoing, we adhere to the threshold of inquiry stated in Phillippe:  "Even if an accused does not volunteer all the facts necessary to establish a defense, if he sets up matter raising a possible defense, then the military judge is obliged to make further inquiry to resolve any apparent ambiguity or inconsistency."  63 M.J. at 310.

B.  Possible Defense or Mere Possibility of Defense?

Having reaffirmed the predicate law in this area, we turn now to Appellee's argument.  Did the military judge abuse his discretion by not inquiring further into a possible defense of duress in light of Appellee's unsworn statement?

The defense of duress applies when:

> the accused's participation in the offense was caused by a reasonable apprehension that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury if the accused did not commit the act.  The apprehension must reasonably continue throughout the commission of the act.  If the accused had any reasonable opportunity to avoid committing

> the act without subjecting the accused or another innocent
> person to the harm threatened, this defense shall not
> apply.

Rule for Courts-Martial (R.C.M.) 916(h).

The Discussion to R.C.M. 916(h) elaborates on the immediacy

of harm:

> The immediacy of harm necessary may vary with the
> circumstances.  For example, a threat to kill a person's
> wife the next day may be immediate if the person has no
> opportunity to contact law enforcement officials or
> otherwise protect the intended victim or avoid committing
> the offense before then.

R.C.M. 916(h) Discussion.

Here, as in Resch, Olinger, and Logan, Appellee's unsworn

statement did not raise the possibility of a duress defense.

The problem for Appellee on appeal is that the plea colloquy and

stipulation of fact, even when read in light of his

presentencing statement, simply do not put the elements of

duress in play in a way that would necessitate further inquiry

and resolution.  In particular, three essential elements of

duress are plainly absent based on Appellee's own factual

recitation and words:  the immediacy between Appellee's actions

and the perceived threat; the continuation of immediacy

throughout the conduct in question; and the opportunity to avoid

the harm threatened.

The nexus between Appellee's acts and his mother's

statements is tenuous:  Appellee's statement indicates that he

14

stole equipment because his mother needed money not because she was threatening suicide. Appellee stated that the first time he stole Navy equipment he did so out of "pure[] curiosity" to find out how much things were worth since his mother needed money and since he wanted to make his mother's phone calls stop. Mrs. Jackson did not threaten to kill herself unless Appellee stole the equipment. In fact, Appellee's bank records indicate that, as of October 31, 2008, he had $24,980.54 in his bank account. Appellee's unsworn statement also indicates that Mrs. Jackson's threats were not immediate. R.C.M. 916(h) makes clear, the threat must be immediate and the accused must not have had "any reasonable opportunity to avoid committing the act without subjecting the accused or another innocent person to the harm threatened." The sheer length of time necessary to carry out Appellee's plan indicates that the situation could not have had the requisite immediacy. Appellee would list the piece of equipment on eBay, wait for a period of days until someone won the auction, take the item from the lab and mail it, receive a transfer from eBay to his PayPal account, and finally transfer the money to his own bank account. That this process occurred over an extended period of days indicates that Appellee could not have been operating under a threat of immediate harm. Appellee's statements about how his mother "would call crying"

on numerous occasions also indicate that the threats were remote in time.

In addition, the sheer length of time during which Appellee stole the equipment indicates that he had numerous occasions to seek help for his mother, and thus an "opportunity to avoid" the harm threatened as required by R.C.M. 916(h). Appellee stole the equipment between October 2008 and February 2009, a five-month span during which he could have attempted to obtain help for his mother's condition. Thus, while the facts on one level speak to the sad decline of a family and perhaps uncommon pressures placed on a young man, on their face they do not present a possible defense of duress. Thus, further inquiry was not required to so determine, and the military judge did not abuse his discretion in accepting the plea.

C. Threat of Suicide as Duress

We turn now to the Government's third certified issue. Of course, having already determined that the military judge did not err in not inquiring further into suicide threats as the source of a duress defense, we are not compelled to do so. However, it is prudent to do so because the issue has been certified by the Government and because heretofore this Court's case law has not squarely addressed the question. The issue has arisen indirectly on a number of occasions and will likely do so again.

The Government contends that, as a matter of law, an individual's suicide threat cannot give rise to a duress defense since it does not constitute an unlawful act against a third party.  The Government derives its third party argument from the rule's requirement that the accused reasonably apprehend "that the accused or another innocent person would be immediately killed or would immediately suffer serious bodily injury." Here, the Government argues, the mother's conduct was not directed against "another innocent person."  The Government finds the requirement for an "unlawful act" as the predicate for duress from dicta found in United States v. Washington, 57 M.J. 394 (C.A.A.F. 2002).  Specifically, the plurality opinion states:  "R.C.M. 916(h) should be viewed in a manner consistent with the requirement in prevailing civilian law that the threat emanate from the unlawful act of another person."  Id. at 398. However, as the Government also acknowledges, this Court's case law can be read to support an opposite result as well.

This Court has not squarely addressed the issue of whether a threat of suicide could present a duress defense.  Two of our cases that discuss threats emanating from non-third-parties, United States v. Rankins, and Washington, for example, addressed inapposite factual scenarios.  The plurality's ruling in Rankins, for example, considered whether an accused, who missed movement because she was afraid that her husband would have a

17

heart attack in her absence, could raise a duress defense.   34
M.J. 326, 326-27 (C.M.A. 1992).   This Court did not address
suicide or specify what was meant by a presumed requirement that
the harm contemplated by R.C.M. 916(h) come from a third party.
Because the threat in Rankins was caused by her husband's health
and not human action, the plurality's statement in dicta that
the "plain language" of R.C.M. 916(h) indicates that the duress
defense "applies only to cases where the coercion is asserted by
third persons" is not determinative in this case.   Id. at
330 n.2.

In United States v. Jeffers, the Court again indirectly
addressed the issue of suicide, appearing to include the threat
of suicide within the duress defense.   57 M.J. 13, 14 (C.A.A.F.
2002).   Though the issue raised in that case did not directly
address whether a suicide threat could form a valid basis for a
duress defense, the Court did note that the "military judge
properly instructed the members that duress was a defense to
appellant's failure to obey his commander's order."   Id. at 15.

In Washington, the Court addressed the issue somewhat more
directly when it affirmed an accused's conviction for
disobedience of a lawful order for refusing an anthrax vaccine.
57 M.J. at 398.   The Court explained that the President's
guidance on the duress defense in R.C.M. 916(h) must be read not
in isolation but rather:

18

> in conjunction with the guidance on disobedience of lawful orders and the essential purposes of military law.  In that context, the military judge correctly ruled that the duress defense in R.C.M. 916(h) should be viewed in a manner consistent with the requirement in prevailing civilian law that the threat emanate from the unlawful act of another person.

Id.  The Court noted earlier in the opinion that the military judge had rejected the defense of duress as unavailable because "it requires an unlawful threat from a human being, and that the defense of necessity was unavailable because it requires a threat from a natural physical force -- neither of which was present in this case."  Id. at 396.[2]

In summary, review of this Court's case law indicates that, while dicta might support one position or another, this Court has not been faced with the direct question posed by Issue III. Another reason the law is unclear is that, with respect to suicide, R.C.M. 916 is susceptible to a number of possible interpretations.  We now conclude, as the CCA did below, that R.C.M. 916 does not foreclose the possibility that a threat of suicide could provide the basis for a duress defense.  This conclusion is consistent with the purpose of the duress defense enunciated by the Supreme Court in Dixon v. United States, 548

---

[2] The Court noted that there might be a situation where an assigned duty "is so mundane, and the threat of death or grievous bodily harm . . . is so clearly defined and immediate, that consideration might be given to a duress or necessity defense," but it noted that it was not faced with such a situation.  Washington, 57 M.J. at 398 (quoting United States v. Rockwood, 52 M.J. 98, 114 (C.A.A.F. 1999)).

U.S. 1 (2006).  It is also consistent with the language of R.C.M. 916(h), limited federal appellate practice that is directly on point, and the Model Penal Code.

First, the conclusion that the threat of suicide could provide the basis for a duress defense is supported by the Supreme Court's holding in Dixon.  The defense allows an individual to avoid liability "'because coercive conditions or necessity negates a conclusion of guilt even though the necessary mens rea was present.'"  548 U.S. at 7 (quoting United States v. Bailey, 444 U.S. 394, 402 (1980)).  An accused "ought to be excused when he is the victim of a threat that a person of reasonable moral strength could not fairly be expected to resist."  Id. at 14 n.9 (quoting 2 Wayne R. LaFave, Substantive Criminal Law § 9.7, at 72 (2d ed. 2003)) (quotation marks omitted).  To exclude suicide from the defense would, as Appellee puts it, shift the analysis from that of whether a person of reasonable moral strength could resist to a mere "head-counting exercise."[3]

Second, the plain language of R.C.M. 916(h) does not preclude a duress defense based on the threat of suicide.  A person who commits suicide may indeed "be . . . killed" -- a person who kills himself is killed by his or her own hand.  And

---

[3] A "head-counting exercise" refers to counting the number of people involved.

a person who threatens suicide is indeed "threatened," for the threatening is done by him or herself. It is not uncommon for the drafters of statutes to use the passive voice to focus on an event that occurred rather than on a particular subject. See Dean v. United States, 129 S. Ct. 1849, 1853 (2009) ("The passive voice focuses on an event that occurs without respect to a specific actor, and therefore without respect to any actor's intent or culpability."). "It is whether something happened -- not how or why it happened -- that matters." Id.

Although "[a]t common law the duress defense applied only to cases where the coercion was asserted by third persons," Rankins, 34 M.J. at 329 (plurality), some jurisdictions follow a broader definition as expressed in the Model Penal Code that does not limit the defense "to any particular source of danger." Id. at 330; see also United States v. Toney, 27 F.3d 1245, 1248 (7th Cir. 1994) (noting that a threat of suicide may be a sufficient basis for coercion if the defendant took reasonable alternative steps to avoid the suicide). Moreover, it is not clear why a person who is not otherwise an accused or the victim of the accused's crime does not, or would not, qualify as a third person for the purpose of duress.[4]

---

[4] Our conclusion that the threat of suicide could be included in the defense of duress is not inconsistent with the Court's ruling in Washington. The Court in Washington was faced with an unlawful act -- a soldier's disobedience of a lawful order. 57

21

Third, this conclusion is consistent with the scant federal case law that has addressed the issue. In Toney, the United States Court of Appeals for the Seventh Circuit noted in passing its approval of the trial judge's instruction that "fear of suicide of another is not a sufficient basis for coercion, unless the defendant took reasonable alternative steps to avoid the suicide." 27 F.3d at 1248, 1250 (holding that the district court's refusal to give the defendant's requested self-defense instruction was not a miscarriage of justice because the defendant had waived the issue and the evidence did not support such an instruction); see also United States v. Stevison, 471 F.2d 143, 147 (7th Cir. 1972) (affirming the denial of a defendant's proposed coercion instruction where the defendant had not alleged that she had no opportunity, other than embezzling funds, to avoid her daughter's threatened suicide). Although neither Toney nor Stevison raised a direct challenge to the issue of whether a threat of suicide is included in the

---

M.J. at 396. As the Court explained, it would make little sense to allow a servicemember to disobey a lawful order based on the reasonable apprehension that he or she, or another innocent person, would immediately be killed or suffer serious bodily injury if he or she complied with the order since one of the "core values of military service [is] the willingness of the individual to sacrifice his or her life or well-being for the sake of the nation." Id. at 397. In this case, however, the threat of suicide, though perhaps not unlawful, is very different from the disobedience of a lawful order that we addressed in Washington.

22

defense of duress, they did offer approval for including the threat of suicide in the duress defense.  This definition of duress/coercion requires three elements:  "(1) an immediate threat of death or serious bodily injury, (2) a wellgrounded fear that the threat will be carried out, and (3) no reasonable opportunity to avoid the threatened harm."  Toney, 27 F.3d at 1248.  In addition, four federal courts of appeals have defined duress in a manner that includes the threat of suicide.  See, e.g., United States v. Santos, 932 F.2d 244, 249 (3d Cir. 1991) ("'In a criminal law context . . . duress contains three elements:  (1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and, (3) no reasonable opportunity to escape the threatened harm.'") (citations omitted); United States v. Tanner, 941 F.2d 574, 587 (7th Cir. 1991) ("'This Circuit follows the common law rule that duress is a defense only if the defendant reasonably feared immediate death or severe bodily injury which could be avoided only by committing the criminal act charged.'") (citation omitted); United States v. Scott, 901 F.2d 871, 873 (10th Cir. 1990) ("A coercion or duress defense requires the establishment of three elements:  (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm.") (citations

omitted); United States v. Charmley, 764 F.2d 675, 676 (9th Cir. 1985) ("The three elements of the duress defense are: (1) immediate threat of death or grave bodily harm; (2) well grounded fear that the threat will be carried out; and (3) no reasonable opportunity to escape.") (citation omitted).

Finally, a conclusion that the threat of suicide may be included in the duress defense is consistent with the Model Penal Code. The Model Penal Code provides a choice-of-evils justification that is not limited to any particular source of danger. Model Penal Code § 3.02(1) (1962) provides that:

> Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:
>
> > (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged; and
> >
> > (b) neither the Code nor other law defining the offense provides exceptions or defenses dealing with the specific situation involved; and
> >
> > (c) a legislative purpose to exclude the justification claimed does not otherwise plainly appear.

Although the Model Penal Code is not binding on this Court, its focus on the significance of the harm rather than any particular source is consistent the United States Supreme Court's statement in Dixon that the threat be such "a person of reasonable moral

strength could not fairly be expected to resist."[5]  548 U.S. at

14 n.9 (citation and quotation marks omitted).

For the foregoing reasons, we do not foreclose the

possibility of a duress defense in the context of a suicide

threat as a matter of law.  We do not decide the question of

what circumstances would give rise to such a defense since this

question is not before the Court.

### III.  CONCLUSION

For the foregoing reasons, certified question one is

answered in the affirmative.  As to certified question two, the

NMCCA erred when it found that Appellee's unsworn statement

raised the possibility of a defense but not because it applied

the prima facie standard.  The NMCCA applied the correct

standard but erred when it held that the statement raised the

possibility of a defense.  Regarding certified question three,

we do not foreclose the possibility of a duress defense in the

context of a suicide threat as a matter of law.  The decision of

the United States Navy-Marine Corps Court of Criminal Appeals is

reversed.  The record of trial is returned to the Judge Advocate

---

[5] In addition, we have used the Model Penal Code as "a source of decisional guidance in military justice."  United States v. Curtis, 32 M.J. 252, 267 (C.M.A. 1991) (citing United States v. Byrd, 24 M.J. 286 (C.M.A. 1987); United States v. Frederick, 3 M.J. 230 (C.M.A. 1977); United States v. Thomas, 13 C.M.A. 278, 32 C.M.R. 278 (1962)).

General of the Navy for remand to that court for further review.

Article 66, UCMJ, 10 U.S.C. §§ 866 (2006).

United States v. Hayes, No. 11-5003/NA

STUCKY, Judge (concurring in the result):

I concur with the majority that an accused need not necessarily establish a defense by prima facie evidence to raise a substantial question regarding his guilty pleas; that Appellee had an opportunity to avoid committing the offenses and, thus, did not raise a possible defense of duress; and that the United States Navy-Marine Corps Court of Criminal Appeals erred by holding that Appellee had raised matters inconsistent with his plea of guilty. I am, however, unwilling to join the majority's dictum that the threat of suicide may give rise to a duress or necessity defense.

Duress is a special defense, long recognized in our jurisprudence, which may excuse criminal conduct when the actor's participation in the offense was caused by a reasonable apprehension that he or another innocent party would immediately suffer death or serious bodily injury if he did not commit the offense. R.C.M. 916(h); Joshua Dressler, Understanding Criminal Law § 23.01[B], at 323 (4th ed. 2006); 2 Wayne R. LaFave, Substantive Criminal Law § 9.7(a), at 72 (2d ed. 2003). The parties argue over whether Appellee's mother was an innocent party. The term "innocent party," as used in the duress defense does not require a determination of whether the act threatened -- in this case, suicide -- was criminal but rather requires that the person who is threatened with death or severe bodily

injury not be the person who is threatening the act.  See

Dressler, supra § 23.01[B] ("another person threatened to kill

or grievously injure the actor or a third party"); 2 LaFave,

supra § 9.7(a).  Although a person threatening suicide may be

innocent in some colloquial or moral sense of the word, that

person is not innocent as that term has been interpreted in the

duress defense situation.  Therefore, as a matter of law, this

case does not raise a duress defense.

Exemptions from the criminal law, such as affirmative or

special defenses, should normally be left to the judgment of the

legislature.  See United States v. Oakland Cannabis Buyers'

Coop., 532 U.S. 483, 490—91 (2001) (concerning the defense of

necessity).  Congress has not codified a military duress defense

and, in light of the defense's long and well-defined history, I

am not in favor of amending the common law definition of

"innocent" to shoehorn suicide within it.  See Dixon v. United

States, 548 U.S. 1, 12—14 (2006) (assuming that, although the

1968 Safe Streets Act did not mention the duress defense,

"federal crimes are solely creatures of statute," and thus the

Court is "required to effectuate the duress defense as Congress

may have contemplated it in the context of these specific

offenses" (citations and quotation marks omitted)).

Nevertheless, any significant change to the understanding of the

common law defense of duress should require legislative enactment.  See id.

As a threat of suicide does not raise a duress defense under military law, I respectfully dissent from Part II.C. of the majority's opinion but concur in the result.